OA 91   Criminal Complaint

# United States District Court

**FILED**

NORTHERN                    DISTRICT OF                    CAILFORNIA **SEP 2 5 2007**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES OF AMERICA
V.

**CRIMINAL COMPLAINT**

MICHAEL MARTIN,
JESSICA SANDERS,
MICHAEL ANDERSON, and
DIALLO MCLINN



Case Number:

## 07-70574 WDB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my

knowledge and belief. On or about May and June 2007 in Alameda                    County, in

the  Northern                    District of  California                    defendant(s) did,

(Track Statutory Language of Offense)

conspire to manufacture and distribute marijuana, a Schedule I controlled substance

in violation of Title 21                    United States Code, Section(s) 846

I further state that I am a(n)  Special Agent with the DEA                    and that this complaint is based on the
                                        Official Title

following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

Approved
As To
Form: H. H. (Shashi) Kewalramani
            AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

_September 24, 2007_
Date

at  San Francisco, California
        City and State

~~U.S. Magistrate Judge Elizabeth D. Laporte~~

Name & Title of Judicial Officer

Signature of Judicial Officer

**Nandor J. Vadas**
**United States Magistrate Judge**

Document No.

District Court
Criminal Case Processing

IN THE UNITED STATES DISTRICT COURT
STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS, CRIMINAL COMPLAINT, AND ARREST WARRANTS

I, William Todd Armstrong, being duly sworn, do hereby depose and state:

### INTRODUCTION, AGENT BACKGROUND, AND SOURCE OF INFORMATION

1.     I make this affidavit in support of (1) search warrants to search three fixed locations identified below and in further detail in Attachments A-1 through A-3 to this affidavit and incorporated by this reference, (2) search warrants to search two vehicles identified below and in further detail in Attachments B-1 and B-2 incorporated by this reference, (3) a criminal complaint charging four individuals identified below with violations of 21 U.S.C. § 846, conspiracy to manufacture and distribute controlled substances between May 2007 and August 2007, and (4) arrest warrants for the same four individuals. Collectively, these three fixed locations shall be referred to as the SUBJECT PREMISES in this affidavit and the two vehicles shall be referred to as the SUBJECT VEHICLES. This investigation involves the cultivation, manufacture, sale, and distribution of marijuana and foods, including candy, infused with marijuana derivatives such as tetra-hydrocannabinol (THC), the psychoactive substance in marijuana, by the following individuals and entities:

      a.      Michael MARTIN, a/k/a Mickey MARTIN (the owner of TAINTED);

      b.      Jessica SANDERS (the manager of TAINTED);

      c.      Michael ANDERSON (a delivery person at TAINTED);

      d.      Diallo MCLINN (a delivery person at TAINTED);

      e.      TAINTED TRUFFLES, a/k/a TAINTED INCORPORATED, TAINTED CLOTHING COMPANY, and TAINTED SKATEWORKS (collectively, "TAINTED"); and

      f.      others

in violation of 21 U.S.C. §§ 841 (manufacture or distribution of controlled substances), 846 (conspiracy to manufacture or distribute controlled substances), and 856 (maintaining a location for the manufacture or distribution of controlled substances). These SUBJECT PREMISES include the facility where the marijuana is cultivated, the facility from where foods containing marijuana derivatives are distributed and stored, and the residence of MARTIN, who is the owner and operator of TAINTED. The SUBJECT VEHICLES include a vehicle identified as being used to transport marijuana and a truck used to transport edibles containing marijuana extract, both of which have license plates indicating MARTIN as the registrant.

1

2.      I am a Special Agent (SA) of the United States Department of Justice, Drug Enforcement
Administration (DEA) and I am the lead case agent assigned to this investigation involving
cultivation, manufacture, sale, and distribution of marijuana and marijuana derivatives. I am
currently assigned to the San Francisco Field Division, Oakland Resident Office Enforcement
Group 1, and have been so employed by the DEA since August 2002. I received formal training
at the DEA Basic Agent Training Academy located at the DEA Training Center in Quantico,
Virginia. This sixteen-week DEA Basic Agent Academy included instruction in, but not limited
to, basic narcotic investigations, drug identification, drug detection, familiarization with United
States narcotics laws, money laundering techniques and schemes, identification and seizure of
drug-related assets, undercover work, and surveillance operations. I have been the affiant and
participated in the execution of multiple search warrants in which controlled substances were
seized. During my tenure with DEA, I have conducted and assisted in numerous narcotics
investigations, of which many investigations involved the cultivation and sale of marijuana and
its derivative products, resulting in the arrests and convictions of numerous individuals for
violations of federal and state narcotics laws. These narcotics investigations involved the
following non-comprehensive list of illegal substances: marijuana (including marijuana laced
edibles), hash and hash oil, crystal methamphetamine, methamphetamine, heroin, ecstasy
(MDMA), crack cocaine, and cocaine.

3.      With respect to the investigation of crimes involving marijuana, I have attended a
national marijuana eradication and suppression conference and completed a sixteen hour indoor
cannabis cultivation investigator's course focusing on the indoor production of marijuana. I have
also received on-the-job training in advanced investigative techniques from senior DEA Agents.

4.      These SUBJECT PREMISES include:

   a.      SUBJECT PREMISES 1 - 947 61st Street, Suite 18, Oakland, California,
           described in further detail in Attachment A-1, which is believed to be the location
           where the marijuana and marijuana derivative infused candies are produced and
           stored;

   b.      SUBJECT PREMISES 2 – 379 40th Street, Oakland, California, described in
           further detail in Attachment A-2, which is believed to be the location where the
           marijuana is cultivated and stored; and

   c.      SUBJECT PREMISES 3 - 3329 Brentwood Avenue, El Sobrante, California,
           described in further detail in Attachment A-3, which is believed to be the
           residence of Michael MARTIN, the owner and an operator of TAINTED, and
           Elinor CLARK.

5.      The SUBJECT VEHICLES include:

   a.      SUBJECT VEHICLE 1 – a black 2005 GMC pick-up truck displaying California
           vehicle license 7V76801 registered to Michael MARTIN at 4096 Piedmont
           Avenue, #134, Oakland, California.

   b.      SUBJECT VEHICLE 2 – a white 2006 GMC van displaying California vehicle
           license 7Y73553 registered to Michael MARTIN at 4096 Piedmont Avenue,
           #134, Oakland, California.

6.    I make this affidavit based on personal knowledge derived from my participation in this investigation and, in part, upon information from oral and written reports about this and other investigations that I have received from other DEA Agents and state law enforcement agencies. All the facts known to me about this investigation are not included within this affidavit. I have set forth only the facts I believe necessary to establish probable cause to believe evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841, 846, and 856 exist within the SUBJECT PREMISES and SUBJECT VEHICLES and in support of a criminal complaint and arrest warrants of MARTIN, SANDERS, MCLINN, and ANDERSON for violating 21 U.S.C. § 846.

## **PROBABLE CAUSE**

A.    Initiation Of Investigation Based On Anonymous E-Mail Tip And
       Identification of MARTIN, TAINTED, And Other Relevant Information

7.    In an April 2004 issue of the Microgram Bulletin, published by the DEA Office of Forensic Science, an Intelligence Alert was published that identified new candy bars that were seized and found to contain marijuana and its potent derivatives such as THC and hashish oil. The seized candy bars were labeled as Stoners and Buddafingas, mimicking the packaging and name of legitimate candy bar brands Snickers and Butterfingers. In the alert, a request was sent by the microgram editor asking for any information about the source of these marijuana candy bars that tested positive for THC.

8.    In June 2005, an e-mail was sent from taintedtruffles@hotmail.com to microgram_editor@mailsnare.net (editor for the Microgram Bulletin) revealing the source of the marijuana candy bars. It is unknown at this time who actually sent the e-mail from taintedtruffles@hotmail.com.[1] The anonymous sender stated that Michael or Mickey John MARTIN, date of birth of February 21, 1974 originally from New York, New York started the company TAINTED TRUFFLES in 2001. The sender identified MARTIN as approximately 5'7" tall, weighing 185 pounds, with brown hair, and hazel eyes. The sender further provided that MARTIN's cellular telephone number was 510-377-1990 and that his e-mail address was kazoowho@sbcglobal.net. On October 26, 2005, SBC Internet Services indicated that Michael MARTIN was the name on the e-mail account of kazoowho@sbcglobal.net with the billing address of 374 40th Street, Oakland, California.

9.    An August 2007 query of a law enforcement database revealed that a Michael MARTIN with the physical characteristics identified in the anonymous e-mail had an alias of Mickey MARTIN and that he had been arrested on several marijuana possession and narcotics possession charges in 1994 and 1995. Additionally, a records check of the California Department of Motor Vehicles (DMV) revealed that MARTIN had brown hair and brown eyes and was 5'8" tall and weighed 185 pounds. The check further provided that his address was 374 40th Street, Oakland, California.

10.    In addition to the identifying information, the anonymous e-mail sender provided the following information regarding TAINTED TRUFFLES:

---

[1] A subpoena was sent to the custodian of records for Hotmail in an attempt to identify the sender of the email. Hotmail responded to the subpoena indicating the name on the account was first name "Tainted" and last name "Truffles." Agents believe that because Hotmail does not verify the truthfulness of the subscriber information, the subscriber name listed with Hotmail is a fictitious name.

a.    TAINTED TRUFFLES began in Oakland, California as a small operation that initially cooked marijuana leaves in butter and made chocolate truffles.

b.    TAINTED TRUFFLES expanded to making the marijuana candy bars such as Buddafingers and Stoners as well as other treats similar to other candies and desserts such as Peppermint Patties and Baklava.

c.    In early 2002, TAINTED TRUFFLES began selling their marijuana treats to San Francisco bay area cannabis clubs, and expanded to the Seattle, Vancouver, and Amsterdam markets.

d.    TAINTED TRUFFLES employed 10 to 15 workers that purchase marijuana from local growers, made the marijuana candy bars, and then distributed the products to the marijuana dispensaries and street users.

e.    TAINTED TRUFFLES also printed and sold t-shirts with the "Adidas" marijuana leaf logo and pictures of the marijuana candy bars on them.

f.    TAINTED TRUFFLES has also been known to distribute ecstasy and cocaine.

g.    TAINTED TRUFFLES was located at 3921 A Opal Street, Oakland, California 94609 with a telephone number of 1-888-taint-me[2] and a website of www.gettainted.com[3].

h.    TAINTED TRUFFLES also uses the aliases of TAINTED, TAINTED CLOTHING COMPANY, and TAINTED SKATEWORKS.

B.    Public Records And Confidential Source Information Confirming Existence Of TAINTED And MARTIN's Involvement With TAINTED

11.    An August 2007 query of the California Secretary of State business records database revealed that there was a company called TAINTED INCORPORATED, was incorporated on June 16, 2005 and that its agent for service of process and address for this business was Michael MARTIN at 374 40th Street, Oakland, California 94609. This address is down the street from SUBJECT PREMISES 2, located at 379 40th Street, Oakland, California. The type of business was listed as a seller of skateboards and related products. Also in August 2007, a query of the California Employment Development Department (EDD) database indicated that neither TAINTED CLOTHING COMPANY nor TAINTED SKATEWORKS are currently registered as businesses. However, TAINTED INCORPORATED registered with EDD on July 2, 2007 and the records identified Michael MARTIN as the CEO. An address of 4096 Piedmont Avenue

---

[2] On July 12, 2005, AT&T responded to a subpoena indicating the subscriber for this number was TAINTED CLOTHING COMPANY, 4096 Piedmont Avenue, #526, Oakland, California. This address is a commercial United Parcel Service (UPS) location with mailboxes that individuals can rent.

[3] A query of www.samspade.org, an Internet domain name search registry, indicated this website belonged to TAINTED CLOTHING COMPANY, under Michael MARTIN, 3921 Opal Street, Oakland, California. The registry further provided a phone number of 510-377-1990 and email of kazoowho@sbcglobal.net for MARTIN. This information corroborates the information provided in the anonymous e-mail tip.

#134, Oakland, California and telephone number of 510-289-6481[4] were also provided as being associated with TAINTED INCORPORATED. This address associated with TAINTED INCORPORATED is actually a United Parcel Service (UPS) store and the #134 refers to the mailbox number. On May 11, 2007, the U.S. Postal Inspection Service provided information that Vincent Minelli, 4225 Lincoln Avenue, Oakland, California, is the applicant for this mailbox.

12.    On March 9, 2007, DEA Special Agents debriefed a DEA confidential source, hereafter referred to as CS, regarding Michael MARTIN and TAINTED Incorporated. From 1995 to 2004, the CS has been arrested for burglary, violation of court order to prevent domestic violence, possession of marijuana for sale, assault and burglary, making annoying phone calls, and reckless driving. In 2001, the CS was convicted of disturbing the peace and served two days in jail. The CS has received monetary payments from the DEA. The CS only knew MARTIN as Mickey and noted that he was the owner of TAINTED. The CS further added that MARTIN started the TAINTED business in Oakland, California then expanded to Southern California, possibly San Diego, with MARTIN's network of friends. The CS learned through a friend that MARTIN distributed samples of his marijuana products at the 2001 Cannabis Cup in Amsterdam, Holland. The CS told agents that MARTIN is responsible for selling and distributing marijuana laced candies, soda, hash oil, as well as processed marijuana buds. The CS stated that MARTIN uses his own recipes and makes the TAINTED products from scratch. The CS was shown a California Driver License photograph of Michael MARTIN. The CS confirmed that Michael MARTIN is the person the CS knows as Mickey.

13.    Since the inception of this investigation (June 2005), agents have observed MARTIN and other individuals believed to be co-conspirators on numerous occasions at 3921 A Opal Street, Oakland, California and 374 40th Street, Oakland, California. These locations are no longer considered target locations of the investigation because it is not believed that MARTIN's organization using these particular addresses. The evolution of the investigation has led agents to the requested search warrant locations for the SUBJECT PREMISES and the SUBJECT VEHICLES that will be further described in this affidavit.

C.    Traffic Stop By Orinda Police Department
       And Identification Of TAINTED Products In April 2006

14.    On April 7, 2006, a police officer with the Orinda Police Department (Orinda PD) in Orinda, California conducted a traffic enforcement stop of Nicholas VERBOOM for failure to wear his seatbelt on California Highway 24. Subsequent to the traffic stop, the officer was able to identify through a California criminal records check that not only was VERBOOM's driver license suspended for driving under the influence (DUI), but he was on court probation for DUI and felony probation in Riverside County, California for sale of marijuana. VERBOOM stated to the police officer that he did not have any identification on him. He added that he was on probation for giving a 17 year old person some TAINTED food. VERBOOM indicated that the car belonged to his employer, Elinor CLARK, who lived on Sanborn Road in Orinda, California. A check with the California Department of Motor Vehicles database revealed that the vehicle was registered to Elinor CLARK, 10 Sanborn Drive, Orinda, California. This Sanborn Drive address in Orinda, California is believed to be a previous home address for MARTIN and Elinor

---

[4] On September 13, 2007, Cingular Wireless responded to a subpoena indicating the subscriber for this number was Michael MARTIN, 4096 Piedmont Avenue, #134, Oakland, California.

CLARK. This belief is based on information gathered as a result of previous surveillances conducted on October 25, 2005 and November 1, 2005 where MARTIN and CLARK were observed coming and going from this address in a manner consistent with residents of that house.

15.    A second Orinda PD officer was dispatched to the area of the traffic stop in order for a search to be conducted of the vehicle VERBOOM was driving. On the front passenger's floorboard was a cardboard box. In the box were several small plastic containers labeled with the brand name TAINTED and stated they contained honey. In the center console below the armrest were six small vials, four of which contained a brown chunky material believed to be hashish or concentrated cannabis. The officers found five more cardboard boxes. Each box was filled with food products labeled TAINTED Medical Edibles. Warnings were also written on the labels stating Medical Use Only and that the food was in compliance with California Health and Safety Code 11362.5. The food items included marijuana-laced popcorn, candies, cookies, honey, chocolate syrup, brownies, and other unknown items. Six more boxes and two paper bags containing TAINTED food items were found within the trunk. Written on one of the cardboard boxes in blue ink was A.H.H.S. Based on my participation in this and other investigations regarding the manufacture and distribution of marijuana, I believe A.H.H.S. refers to Alternative Herbal Health Services, which is a marijuana dispensary located in West Hollywood, California. Digital photographs of the TAINTED products within the car were taken and ultimately submitted into evidence. The TAINTED edible products were not seized by the officer. Officers also found a California identification card for VERBOOM within the car.

16.    Officer McCormack subsequently cited VERBOOM for violation of the seatbelt law, driving on a suspended license, and was escorted off the highway. The vehicle was also impounded by Orinda PD. VERBOOM was given the opportunity to take the TAINTED products with him but declined.

17.    Later that day, the same Orinda PD officer that initiated VERBOOM's traffic stop encountered Elinor CLARK retrieving a vehicle release from the police department so she could get her car from impound. The officer identified himself as the individual that towed her car early and asked CLARK if she let VERBOOM drive her car. CLARK stated that she did not know VERBOOM and that she had left the car with her boyfriend in Berkeley because she was trying to sell it. She further stated that she did not know VERBOOM was driving the car. The officer asked CLARK if the car was stolen or if VERBOOM was driving the car without permission. CLARK explained that the car was not stolen and it was okay that VERBOOM was driving the car, but still denied knowing VERBOOM. The officer told CLARK that the vehicle contained several boxes of THC laced food products. CLARK stated that she did not know anything about the food products, nor did she ask for the items to be removed.

18.    A review of the digital photographs of the white cardboard boxes of food products that were in the vehicle revealed that the boxes had the words Chocolate Flavored Apeels printed on them further containing a code of 9760C25. Based on information obtained during the course of this investigation, I know that Apeels is a brand name specific to Guittard Chocolates, a nationally recognized chocolate company based out of Burlingame, California, and are chocolate wafers that Guittard Chocolates sold and marketed for cooking. Further, I learned that Guittard product code 9760C25 refers to dark chocolate flavored Apeels.

D.    TAINTED Customers Identified In Southern California As A Result Of Search

Warrants Executed In The Los Angeles, California Area As Recently As July 2007

19.     On July 11, 2006, agents from the DEA Los Angeles Field Division (LAFD) and officers from the Los Angeles Police Department (LAPD) executed a federal search warrant at the Compassionate Collective Center at 14532 Friar St, Van Nuys, California.  This location was identified as a marijuana dispensary in their investigation.  During the search warrant, agents seized evidence, including that revealed a business card for TAINTED INCORPORATED.  The business card provided the following information:

> Kerry RILEY – vice president
> Address: 374 40th Street, Oakland, CA 94609
> Phone: P.888-TAINT-ME, C.510-760-9550, F.510-595-6987

20.     A criminal history records check revealed that RILEY was convicted for misdemeanor marijuana possession in San Antonio, Texas in 2003.

21.     Agents also recovered a product order form for TAINTED Medicinal Edibles during this same search at the Van Nuys facility.  The order form listed 42 different types of marijuana edibles, such as BAR-1 (Buddafinga), BAR-8 (Stoner's), CUP-1 (Reefer's), and BREAK BAR-2 (Kief Kat).  The prices ranged from $2.50 to $20.00 for each item, depending on the type and strength of marijuana product ordered.  Based on my review of the information, it appears that the pricing of the products was related to the potency of the product, such that a product with a higher amount or concentration of THC would be more expensive than a less potent product.  The order form did not contain any contact information for TAINTED.

22.     On March 9, 2007, LAPD and DEA LAFD executed a California State search warrant at Trichrome Healing Center, 7100 Van Nuys Boulevard, Suite 204, Los Angeles, California.  Trichrome Healing Center was a marijuana dispensary.  During a search of the employee area within the establishment, a DEA Special Agent observed a TAINTED Medicinal Edibles business card hanging on one of the walls listing Jessica SANDERS as the General Manager.  A criminal history records check for SANDERS revealed that in 1998, she was arrested for felony marijuana possession in Douglas County, Nevada.  The business card also provided a telephone number of 510-289-5265.

23.     Based on information provided by Cingular Wireless, the phone number 510-289-5265 is a cellular phone number assigned to Kerry RILEY, at 785 Central Avenue, Alameda, California.  As a result of this investigation, I learned that this address did not exist.  Based on my training and experience and conversations with other agents, I know it is common for narcotics traffickers to use fictitious addresses in an attempt to hide their true whereabouts from rival drug traffickers as well as law enforcement.  Additionally, a review of the toll records and the use of an Internet telephone directory search revealed that between February and May 2007, this number was used to call at least 15 known marijuana clubs, including Farm Assist Caregivers, West Valley Caregivers, Toluca Lake Collective, Venice Beach Care Center, Sweet Relief Compassionate Center, PCH Collective, California Patients Group, Sunset Collective, and Berkeley Patients Group.

24.     On July 25, 2007, DEA LAFD and LAPD executed ten federal search warrants in West Hollywood, California.  Two of the search warrants were executed at the marijuana dispensaries, California Patients Group, 6208 Santa Monica Boulevard, Los Angeles, California, and Sunset

Collective, 7065 ½ Sunset Boulevard, Hollywood, California. At both locations, completed TAINTED Medicinal Edible order forms were seized. Specifically, two of the order forms seized from Sunset Collective dated May 16, 2007 and June 15, 2007 were addressed to "Jessica" at fax number 510-450-0199 and attached to one of the order forms was a business card for Michael MARTIN. On August 9, 2007, AT&T provided a subpoena response indicating that 510-450-0199 is subscribed to Kerry RILEY, 947 61st Street, Suite 18, Oakland, California. The card stated that MARTIN was the CEO/President for TAINTED SKATEWORKS, phone of 888-TAINT-ME (824-6863), and cellular phone number of 510-377-1990. On July 5, 2007, Cingular Wireless provided a subpoena response indicating that the number 510-377-1990 is subscribed to Michael MARTIN, 4096 Piedmont Avenue, #134, Oakland, California. The "Jessica" listed on these forms appears to be the same Jessica SANDERS listed on the business card as the General Manager for TAINTED Medicinal Edibles recovered from the previous marijuana dispensary searched in Southern California on March 9, 2007. These order forms were nearly identical to the previously mentioned order forms, except the new forms provided more products.

E.      Identification Of SUBJECT PREMISES 1 As The Warehouse Unit
        Where The Candies Containing THC Are Distributed

        i.      Surveillance Of Individuals Coming And Going From SUBJECT PREMISES 1 On
                May 10, 2007 And Loading Chocolates Into SUBJECT VEHICLE 1

25.     On May 10, 2007, DEA Special Agents conducted surveillance of the building containing SUBJECT PREMISES 1. Agents learned of SUBJECT PREMISES 1 by following MARTIN to this building containing SUBJECT PREMISES 1 on a prior surveillance. At approximately 11:20 am, I observed a maroon Nissan Armada bearing California vehicle registration 5KAE411, which according to California DMV records was registered to Jessica SANDERS at 21228 Gary Drive, Apartment 203, Castro Valley, California parked in front of the building containing SUBJECT PREMISES 1.

26.     At approximately 2:45 pm, a DEA Special Agent observed a person believed to be SANDERS leave SUBJECT PREMISES 1 through the main door to the building, enter the driver seat area of the parked Nissan Armada, and depart the area. I believed that this person was SANDERS because her appearance matched the description and picture of SANDERS' California Driver's License. A few minutes later, I observed a person appearing to be SANDERS arrive and enter the parking lot to BERKELEY PATIENTS GROUP (BPG), 2747 San Pablo Ave, Berkeley, California. Based on my experience and investigation, I know that BPG is a marijuana dispensary in Berkeley, California. A few minutes later, at approximately 2:58 p.m., I observed SANDERS' drive out of the BPG parking lot and followed her back to the building containing SUBJECT PREMISES 1. After returning to the address containing SUBJECT PREMISES 1, I saw SANDERS exit the car and walk into the front of the building containing SUBJECT PREMISES 1. While there, I also saw SUBJECT VEHICLE 1 parked at SUBJECT PREMISES 1. As set forth below, on April 18, 2007, I saw SUBJECT VEHICLE 1 parked outside MARTIN's residence, which is SUBJECT PREMISES 3.

27.     At approximately 3:10 pm, I observed a white male, later identified as Michael ANDERSON, based on my review of California driver's license records, exit the door of the building containing SUBJECT PREMISES 1, enter into the driver's side area of SUBJECT VEHICLE 1, and depart the area. I followed SUBJECT VEHICLE 1 to SUBJECT PREMISES

2, the marijuana growing facility, where SUBJECT VEHICLE 1 stopped at approximately 3:19 p.m. and I saw ANDERSON speak to two individuals through the driver side window of the truck. I saw that these two individuals came out of SUBJECT PREMISES 2 and then re-entered SUBJECT PREMISES 2, after ANDERSON left at approximately 3:27 p.m.

28.    On the same day, at approximately 4:54 p.m., I observed ANDERSON in SUBJECT VEHICLE 1 return to the building containing SUBJECT PREMISES 1. SUBJECT VEHICLE 1 backed into the parking spot in front of the garage roll-up door to the left of the front entrance controlling access to building containing SUBJECT PREMISES 1. ANDERSON exited the driver's side of SUBJECT VEHICLE 1 carrying a white plastic garbage bag. Meanwhile, the garage roll-up door opened, exposing SUBJECT PREMISES 1, and another person, later identified as Diallo MCLINN as a result of a traffic stop, appeared from inside SUBJECT PREMISES 1. For the next several minutes, ANDERSON, MCLINN, and an unknown white male were observed loading multiple white and brown cardboard boxes into SUBJECT VEHICLE 1. SANDERS was also observed standing and talking to the individuals briefly in the garage door area but was not loading boxes. While they were loading boxes, I observed that one of the logos on the white boxes was the written word Apeels, which based on my investigation was a description of a particular type of chocolate product sold by Guittard Chocolate Company. This was the same Apeels name on the boxes found in the car registered to CLARK that was stopped by Orinda PD on April 7, 2006 and believed to contain items containing marijuana or marijuana derivatives.

29.    A little while later, I saw ANDERSON, MCLINN, and the unknown white male enter back inside SUBJECT PREMISES 1 through the roll up door. A short while later, I saw MCLINN load more boxes into SUBJECT VEHICLE 1. These boxes were white and had handles. MCLINN then closed the bed area of SUBJECT VEHICLE 1. ANDERSON also exited the location. Simultaneously, SANDERS exited the warehouse and walked to her Nissan Armada. ANDERSON and MCLINN also entered into the SUBJECT VEHICLE 1. The Armada and SUBJECT VEHICLE 1 left the location at the same time.

30.    At approximately 5:16 pm, I observed Oakland Police Department (OPD) Officer Scott Wong and Officer Sammie Kim perform a traffic enforcement stop of SUBJECT VEHICLE 1 because the right rear brake light was not working, which was a violation of California vehicle code 24252A requiring that all lights must work properly on a vehicle. This traffic stop was made at my request. OPD Officer Kim approached the driver of the vehicle and asked for his driver's license, registration, and proof of insurance. The driver and passenger provided the following information:

> Name – Michael Franklin ANDERSON
> Address – 4110 Howe St, Oakland, CA 94611
> CA DL – E1772580
> DOB – 03-17-1965
>
> Name – Diallo Imani MCLINN
> Address – 1609 5th St, Berkeley, CA
> CA DL – A3779563

31.    ANDERSON further provided the registration for SUBJECT VEHICLE 1. ANDERSON provided an interim driver license from the DMV and a passport. As ANDERSON was looking

through his property, OPD Officer Kim observed that ANDERSON had a cannabis card. OPD
Officer Kim asked ANDERSON if that was an identification, to which he replied no and put the
card away. The insurance information provided that SUBJECT VEHICLE 1 was insured under
Michael MARTIN's name at 4096 Piedmont Ave, #134, Oakland, California. During the
interview, ANDERSON provided the following information:

> SUBJECT VEHICLE 1 belonged to his boss, Michael MARTIN.
> The van that he normally drove just went into service.
> He worked for a candy company located in Oakland.
> The candy was made for conventions, parties, and catering.
> He was glad that he was stopped because he was going on a long trip the
> following day and he rather be stopped locally than be someone else.
> Food, candy, and perishables were in the boxes that were in the rear of the truck.
> He and MCLINN lived together at 4110 Howe St.

32.     OPD Officer Kim noted that MCLINN appeared visibly nervous. When ANDERSON
handed over his passport for identification, the passport contained a yellow post-it note with
writing on it. The post-it-note contained the names Daniel and Nicole, and the words Green
Goddess, 5713 Figueroa, Highland Park. Based on my knowledge and experience involving
marijuana investigations and conversations with other investigators, I know the Green Goddess
to be a marijuana dispensary in Highland Park, California. ANDERSON was cited with a fix-it
ticket under California VC 24252A and all identification and paperwork was returned to him. At
approximately 5:35 pm, the officers cleared from the traffic stop. Meanwhile, surveillance
continued on SANDERS.

33.     At approximately 5:21 pm, a DEA Special Agent observed SANDERS arrive in her
Armada at SUBJECT PREMISES 2 and park in front of the warehouse. She exited from the
vehicle and used keys to open the front door.

34.     At approximately 5:43 pm, a DEA Special Agent observed ANDERSON and MCLINN
arrive in the vicinity of SUBJECT PREMISES 2 in SUBJECT VEHICLE 1. ANDERSON
parked on Opal Street just south of 40th Street. ANDERSON and MCLINN exited SUBJECT
VEHICLE 1 and walked to SUBJECT PREMISES 2. After knocking on the front door, the two
individuals entered the location.

35.     At approximately 5:52 pm, ANDERSON, MCLINN, and SANDERS all exited the
SUBJECT PREMISES 2 and went to their respective vehicles. The DEA Special Agent
observing ANDERSON, MCLINN, and SANDERS called telephone number 510-461-1496,
which is a suspected cellular number for SANDERS. As the DEA Special Agent heard the
telephone ring, he observed SANDERS answer a cellular telephone with her right hand and
moved it to her face. She said hello. The DEA Special Agent then hung up without saying
anything. SANDERS was sitting in her vehicle at the time of the call. ANDERSON and
MCLINN walked out of view of surveillance agents.

36.     At approximately 6:40 pm, a DEA Special Agent saw SANDERS' Nissan Armada
parked in the vicinity of 4110 Howe Street, Oakland, California, which is the residence of
ANDERSON and MCLINN.

> ii.     *August 13, 2007 Purchase Of TAINTED Products Confirming Storage Of The
> Products at SUBJECT PREMISES 1 And The Infusion Of Marijuana Derivatives*

37.    During the week of July 8, 2007, the CS described previously, placed a recorded telephone call to Michael MARTIN at 510-377-1990 under the supervision of DEA Special Agents. As set forth previously in paragraph 24, MARTIN is listed as the subscriber for the 510-377-1990 telephone number and MARTIN has been assigned this number since November 4, 2005. The purpose of the telephone call was for the CS to obtain an order form from TAINTED Incorporated and potentially negotiate the future transaction of TAINTED marijuana edibles. During the call, the CS asked for an order form. MARTIN inquired if the CS had a fax machine. MARTIN further added that he would have "Jessica," his manager, call the CS and go through the list and particulars of ordering. Based on other information gathered during the course of the investigation, it appears that the "Jessica" that MARTIN is referring to is Jessica SANDERS, who was previously identified as a manager of TAINTED as a result of a business card obtained by DEA during the March 9, 2007 search in Southern California listing SANDERS as the general manager.

38.    Between the dates of July 8, 2007 and August 13, 2007, the CS had several telephone calls with Jessica SANDERS. The initial call was made by SANDERS to the CS. This call was made from telephone number 510-420-0591. According to records from AT&T for the 510-420-0591 number, Kerry RILEY at SUBJECT PREMISES 1 was the subscriber during this time period.

39.    During the time period that these calls were occurring, SANDERS provided the CS with a faxed copy of a TAINTED Medicinal Edibles order form. This order form appeared to be identical to the TAINTED order forms seized in July 2007 in Southern California. SANDERS also provided the CS with her cellular telephone number of 510-289-5265, which, as described previously in paragraph 23, Cingular provided to Kerry RILEY at the fictitious address in Alameda, California, and that was used to call numerous known marijuana clubs. With the assistance of DEA Special Agents, the CS completed the TAINTED Medicinal Edible order form, $1,260.00 worth of TAINTED products. Some of the products ordered were 10 regular strength bars of BAR-8 (Stoner's) at $4.00 each, 10 extra strength bars of FLAT BAR-2 (Mr. Greenbud) at $8.00 each, and 5 jars of SPEC-8 (Splif peanut butter) at $20.00 each. I know that based on my experience and training, "Splif" is a term that refers to marijuana and marijuana cigarettes. The completed form was returned to SANDERS at TAINTED at fax number 510-450-0199 (described in paragraph 24) as also being assigned to Kerry Riley at SUBJECT PREMISES 1. These phone calls were mainly to negotiate the particulars of the future narcotics transaction.

40.    On August 13, 2007, at approximately 12:03 p.m., several DEA Special Agents established surveillance at the building containing SUBJECT PREMISES 1 in anticipation of a TAINTED representative departing that location with the CS's order of marijuana edibles to a predetermined location established by the CS and SANDERS. At approximately 12:28 pm, one DEA Special Agent observed a navy blue Volkswagen Beetle, bearing California license plate 4MXH518 travel on 61st Street and park in the vicinity of SUBJECT PREMISES 1. According to California DMV records, this license plate and car are registered to Jenny RAWSON at 26000 Fairview Avenue, Hayward, California. Moments later, the same DEA Special Agent that saw the car park near building containing SUBJECT PREMISES 1, observed a white female, approximately 5'6" in height, 150 pounds, and wearing a black one-piece dress, exit the driver side of the Volkswagen and walk inside the building containing SUBJECT PREMISES 1 through the front door. Based on a review of Jenny RAWSON's picture on her California

11

Driver's License, the DEA Special Agent confirmed that the female he saw appeared to be Jenny RAWSON.

41.    At approximately 1:23 p.m., a DEA Special Agent observed RAWSON exit SUBJECT PREMISES 1 through the front door of the building and walk toward her aforementioned Volkswagen. Shortly thereafter, the same DEA Special Agent observed RAWSON enter the driver side to the Volkswagen and drive directly to the front of SUBJECT PREMISES 1 near the curb of the front door of the building.

42.    Moments later, the same DEA Special Agent saw MCLINN exit SUBJECT PREMISES 1 through the front door of the building and stand in front of the premises. The DEA Special Agent saw MCLINN holding a large white box and a smaller brown box and also saw a white female wearing blue jeans and a black shirt, identified as Jessica SANDERS, walk from the vicinity of Lowell Street to 61st Street where the Volkswagen was parked. Both MCLINN and SANDERS met near RAWSON's Volkswagen. At that time, the DEA Special Agent saw MCLINN load the large white box and the smaller brown box into the front passenger side of the Volkswagen.

43.    At approximately 1:25 p.m., a DEA Special Agent observed SANDERS hand MCLINN a different brown box just before both of them re-entered the building containing SUBJECT PREMISES 1 through the front door of the warehouse. Shortly thereafter, DEA Special Agents followed the Volkswagen and saw it travel from the building containing SUBJECT PREMISES 1 to the meeting location agreed to by the CS and SANDERS. According to the DEA Special Agents, the Volkswagen did not make any stops and nothing else was placed or taken out of the Volkswagen after being loaded with the boxes near SUBJECT PREMISES 1 until arriving at the meeting location parking lot.

44.    At approximately 1:32 p.m., a DEA Special Agent saw the Volkswagen travel inside the designated parking lot and park next to the CS vehicle. At that time, the CS stood at the driver side of the CS vehicle. A moment later, the CS was seen walking to the parked Volkswagen, spoke briefly with RAWSON at the passenger side of the Volkswagen, then opened the passenger side door. The CS was wearing a transmitting device. The transmission was recorded by Agents. Just at that time, the driver side door of the Volkswagen was seen opening and RAWSON exited the vehicle. A DEA Special Agent saw RAWSON walk from the driver side of the Volkswagen to the already opened passenger door of the Volkswagen. A DEA Special Agent then saw RAWSON lean inside the vehicle and give the CS the white and brown boxes loaded into the car by MCLINN at SUBJECT PREMISES 1.

45.    A short time later, a DEA Special Agent saw RAWSON sit in the passenger side of the Volkswagen and hand the CS a white piece of paper. This white piece of paper was later given by the CS to me after the transaction took place and I determined that the white piece of paper appeared to be a TAINTED sales invoice, which was a photocopy of the same order form previously submitted to the TAINTED business by the CS. A difference between the invoice and order form submitted by CS was that the sales invoice displayed the handwritten notes "Mon @ 12 pm" in the top, right corner of the invoice. This appears to be the day and time the delivery took place.

46.    A DEA Special Agent observing the transaction between the CS and RAWSON then saw the CS give RAWSON a white plastic bag that contained $1,260. After what appeared to be a

brief conversation, another DEA Special Agent saw the CS and RAWSON shake hands and walk to the driver side of their respective vehicles.

47.    After this transaction, DEA Special Agents continued following RAWSON's Volkswagen and saw her counting the money and ultimately returning to SUBJECT PREMISES 1 approximately 20 minutes after the boxes containing the items ordered by the CS were delivered. She entered through the front door of the warehouse.

48.    Immediately after the transaction, I retrieved the boxes that RAWSON provided to the CS and found that they contained products bearing the TAINTED Medicinal Edibles labels. Further, the boxes contained exactly what had been previously ordered on the TAINTED order form sent by the CS. These labels also provided, in the active ingredient section of the labels, that the products contained the drug tetrahydrocannabinol (THC), which is the psychoactive derivative of marijuana. These exhibits were submitted to the DEA Western Laboratory for analysis on August 15, 2007. Random samples of the purchased products revealed the presence of THC.

F.    Surveillance Of SUBJECT PREMISES 2 Beginning In May 2007 Appearing To Confirm That Marijuana Is Being Grown There And Electricity Consumption At SUBJECT PREMISES 2 Consistent With Marijuana Cultivation

    i.    *May 9, 2007 Surveillance Confirming MARTIN's Involvement With The Operations At SUBJECT PREMISES 2*

49.    On May 9, 2007, at approximately 10:55 a.m., I observed a charcoal gray Honda 4-door parked in front of SUBJECT PREMISES 2. Approximately two minutes later, I observed MARTIN exited the driver's seat carrying a black tote bag. MARTIN unlocked the door to SUBJECT PREMISES 2 and then entered the establishment. The vehicle displayed California license plate 5KHZ602. A query of the California DMV revealed the vehicle was a 2005 Honda 4-door registered to Elinor CLARK, 10 Sanborn Road, Orinda, California. As set forth previously, during prior surveillances, MARTIN and CLARK were seen coming and going from the 10 Sanborn Road address, such that it is believed that this was MARTIN and CLARK's prior residence.

    ii.    *June 28, 2007 Surveillance Where Marijuana Was Identified Being Taken Out Of SUBJECT PREMISES 2*

50.    On June 28, 2007, at approximately 1:58 p.m., two DEA Special Agents conducted a surveillance of SUBJECT PREMISES 2. This location is a warehouse that has been previously identified to be associated with TAINTED, Incorporated.

51.    At that time, one DEA Special Agent observed SUBJECT VEHICLE 2 parked in front of SUBJECT PREMISES 2. A query of the California DMV database revealed the vehicle is a 2006 GMC van registered to MARTIN at 4096 Piedmont Avenue, #134, Oakland, California. The DEA Special Agent noted that the side and rear doors of the van were open at that time and shortly thereafter, a white male adult, identified as Michael ANDERSON was seen exiting the warehouse and stand near the van. Moments later, the same DEA Special Agent saw one other unidentified white male adult and two unidentified black male adults stand in front of the warehouse by ANDERSON and the aforementioned van.

13

52.    At approximately 2:00 p.m., ANDERSON was seen walking in and out of the warehouse on two occasions, each time carrying a large black garbage bag from the warehouse to inside the van. The second bag that ANDERSON loaded into the van appeared to be very full and seemed heavier than the first bag that ANDERSON loaded. During that time, one of the black male adults also carried one or two black garbage bags from the warehouse into the van.

53.    Just as the three or four black garbage bags were loaded into the van, another DEA Special Agent walked by the van (doors still open) and smelled an odor consistent with that of marijuana emanating from inside the van. Based on the DEA Special Agent's training and experience, the DEA Special Agent is familiar with the odor of marijuana. Based on my experience and training, marijuana is often transported in large black garbage bags because they are sturdy and hide the contents of the bag.

54.    At approximately 2:05 p.m., ANDERSON entered the driver side of SUBJECT VEHICLE 2, and an unidentified black male (the same individual who carried one or two of the black bags into the van) entered the passenger side of the van. The van then departed east on 40th Street. Surveillance did not follow the van. Shortly thereafter, surveillance was terminated.

    iii.    *Review Of PG&E Electricity Records Consistent
            Marijuana Cultivation At SUBJECT PREMISES 2*

55.    PG&E records obtained as part of the investigation show that MARTIN is the subscriber for account identification number 0991886455379 associated with SUBJECT PREMISES 2. On February 23, 2007, May 31, 2007, and August 8, 2007, PG&E provided usage records and account information for service at SUBJECT PREMISES 2. The usage records covered the time period of December 2, 2005 through July 7, 2007, with the most recent billing date being July 20, 2007. This most recent bill was for $2,958.81, and according to PG&E records this bill was paid on August 7, 2007. The records indicated that the account was established on November 29, 2005.

56.    Below is a summary of the electricity consumption from these bills, with the top most usage being the most recent information obtained. In order to analyze what the electricity usage indicates, I obtained information from the Alameda County Assessor's Office over the Internet for SUBJECT PREMISES 2, which provided that SUBJECT PREMISES 2 was built in 1928 and had 2,663 square feet of livable space. Based on my experience and training, I have learned that the average older home in the San Francisco Bay Area uses between 700 and 1200 kilowatt hours per month and the average square footage of a single family residence is 1,200 to 1,600 feet.

| Start Date | End Date | Current Amount | Payoff Amount | Usage (kwh*) |
|---|---|---|---|---|
| 06-20-2007 | 07-20-2007 | $2,950.09 | $2,950.09 | 14,892.00 |
| 05-18-2007 | 06-20-2007 | $3,841.75 | $3,841.75 | 19,406.00 |
| 04-18-2007 | 05-18-2007 | $2,929.62 | $2,929.62 | 16,596.00 |
| 03-20-2007 | 04-18-2007 | $3,024.52 | $3,024.52 | 20,987.00 |
| 02-20-2007 | 03-20-2007 | $1,517.33 | $1,517.33 | 10,467.00 |
| 01-18-2007 | 02-20-2007 | $2,870.78 | $2,870.78 | 19,759.00 |

14

| 12-18-2007 | 01-18-2007 | $1,779.99 | $1,779.99 | 12,210.00 |
| 11-16-2006 | 12-18-2006 | $3,565.10 | $3,565.10 | 24,515.00 |
| 10-18-2006 | 11-16-2006 | $1,765.88 | $1,765.88 | 10,410.00 |
| 09-19-2006 | 10-18-2006 | $2,068.95 | $2,068.95 | 10,415.00 |
| 08-21-2006 | 09-19-2006 | $2,052.28 | $2,052.28 | 10,415.00 |
| 07-20-2006 | 08-21-2006 | $2,540.77 | $2,540.77 | 13,106.00 |
| 06-20-2006 | 07-20-2006 | $2,190.51 | $2,190.51 | 11,294.00 |
| 05-19-2006 | 06-20-2006 | $2,020.71 | $2,020.71 | 10,409.00 |
| 04-19-2006 | 05-19-2006 | $1,708.77 | $1,708.77 | 9,759.00 |
| 03-21-2006 | 04-19-2006 | $1,265.69 | $1,265.69 | 8,954.00 |
| 02-17-2006 | 03-21-2006 | $1,659.59 | $1,659.59 | 11,962.00 |
| 01-19-2006 | 02-17-2006 | $31.67 | $31.67 | 142.00 |
| 12-19-2005 | 01-19-2006 | $32.85 | $32.85 | 152.00 |
| 12-02-2005 | 12-19-2006 | $36.95 | $36.95 | 239.00 |

*kwh = kilowatt hour

57.     Based on my training, experience, and conversations with other DEA Special Agents who have experience in marijuana cultivation investigations, I am aware that it is common for indoor marijuana cultivators to have unusually high electrical bills. The equipment used in indoor marijuana cultivations such as high intensity lights require a large amount of electricity for power. It is also common for there to be a direct correlation between the electrical usage and the harvesting period of marijuana. The higher degree of electrical usage indicates the stimulation of the growth of the marijuana plants, while the tapering of the electrical usage indicates the budding period of the marijuana plants. I believe that the low kilowatt usage from December 2, 2005 to February 17, 2006 indicates that this was the time spent used to prepare and build the indoor growing operation. Moreover, the high constant kilowatt usage does not correlate with the cycle of temperate change that occurs from the winter months to summer months. Consequently, I believe this electricity consumption information further provides probable cause to believe that SUBJECT PREMISES 2 is being used to grow marijuana

G.      Surveillance And Evidence Suggesting That
        SUBJECT PREMISES 3 Is MARTIN And CLARK's Residence

58.     On April 18, 2007, at approximately 10:12 am, I observed an unknown black male (UBM) in the driveway of SUBJECT PREMISES 3. SUBJECT PREMISES 3 was identified as a result of an Internet credit database (Lexis Nexis) search of Elinor CLARK's, where the database revealed that CLARK used the SUBJECT PREMISES 3 address for a credit reference. Moreover, both the California DMV and AT&T records indicate that SUBJECT PREMISES 3 as CLARK's residence. The UBM picked up a full black garbage bag from the back of a black GMC pickup truck with camper shell that was backed into the driveway. The UBM carried the bag in both arms extended and walked into the side yard through a gate to the left of the house as you face it. SUBJECT VEHICLE 1 was also parked in front of SUBJECT PREMISES 3. As set forth previously, SUBJECT VEHICLE 1 is also registered to MARTIN. SUBJECT VEHICLE 1 was parked beside a blue and white Sea Ray ski boat. The boat displayed registration CF7765RM. A query of the California DMV database revealed the boat is registered to Michael MARTIN, 4096 Piedmont Avenue, #134, Oakland, California – the same UPS mailbox address provided to EDD as TAINTED's address and the same address listed for the registration of SUBJECT VEHICLES 1 and 2. Moments later, I observed the UBM and MARTIN exit from

the same gated area and stand in the driveway behind the pickup truck. I identified MARTIN by comparing him with a California DMV photograph of Michael MARTIN, B7342366. Based on my experience, training, and as a result of this investigation, I believe that the garbage bag contained marijuana, similar to the black garbage bag's loaded from SUBJECT PREMISES 2 on June 28, 2007, which another DEA Special Agent believed contained marijuana based on the smell of marijuana emanating from them as they were being loaded into a van.

59.    On May 8, 2007, at approximately 11:45 p.m., another DEA Special Agent and I traveled to SUBJECT PREMISES 3, in order to perform a trash search of garbage cans (blue recycle container and brown trash can) located curbside on the street in front of SUBJECT PREMISES 3.

60.    As a result of conducting this off-site search of the blue recycle container and brown trash can, the other agent and I recovered items, including the following items indicating MARTIN's use of SUBJECT PREMISES 3 as his residence, MARTIN's familiarity with Elinor CLARK, and the likelihood that SUBJECT PREMISES 3 will contain evidence, fruits, and instrumentalities of his and others involvement with TAINTED related to the cultivation and distribution of marijuana and products containing marijuana derivatives:

   a.    white envelope bearing the handwritten words "Mickey & Ellie"

   b.    torn piece of cardboard bearing "Mickey MARTIN & Ellie CLARK, 3329 Brentwood Avenue, El Sobrante, California 94803

   c.    Home Depot envelope with yellow Post Office sticker (Notify Sender of New Address), Michael J. MARTIN, 4096 Piedmont Avenue, Oakland, California 94611-5221

   d.    Holiday Inn, 120 Colorado Avenue, Santa Monica, California 90401 (tel: 310-451-0676, fax: 310-393-7145) room receipt for Jessica SANDERS; arrival 4-27-07, departure 4-28-07, room #317, total: $427.00

   e.    Yellow Oakland Auto Company Privacy Notice displaying the signature of Michael MARTIN, dated 4-23-07

   f.    White paper titled "To Do List:"

      i.    Oakland Taxes
      ii.   Fictitious Name
      iii.  State BOE
      iv.   Meet w/Kris
      v.    Get Warehouse Ready
      vi.   Cargo Van
      vii.  Check Extra Strength
      viii. Tax Estimation?
      ix.   Delisa

g.   Marinemax of California receipt, 1363 Embarcadero, Oakland, California; customer: Michael MARTIN, 4096 Piedmont Avenue, #134, Oakland, California 510-377-1990, dated 4-11-07; amount: $595.14.

h.   Postcard from Dr. Massood Darvish addressed to Michael MARTIN, 374 40th Street, Oakland, California 94609.

61.   On September 12, 2007, at approximately 12:45 p.m., another trash search of garbage cans (blue recycle container and brown trash can) located curbside on the street to the left of the driveway at SUBJECT PREMISES 3 was performed by myself and another DEA Agent.

62.   As a result of conducting this more recent off-site search of the blue recycle container and brown trash can, the other agent and I recovered items, including the following items indicating MARTIN's use of SUBJECT PREMISES 3 as his residence, MARTIN's familiarity with Elinor CLARK, and the likelihood that SUBJECT PREMISES 3 will contain evidence, fruits, and instrumentalities of his and others involvement with TAINTED related to the cultivation and distribution of marijuana and products containing marijuana derivatives:

a.   White piece of paper titled "TAINTED INC. Payroll Summary, 1/1/07 – 8/16/2007" further documenting a spreadsheet containing the names of Elinor CLARK, Michael MARTIN, and Kerry RILEY, as well as expenditures for the time period covering 6/16/07 to 8/16/07

b.   One (1) "Compassion Medicinal Edible" foil candy wrapper further labeled "High Protein Energy Bar" Spec 13 ingredients: diced dried apricot, diced dried dates, honey, oats, hempseed, cannabis butter (primarily indica), brown rice syrup

c.   Yellow post-it note bearing the handwritten notes:
       800 Trim
       296 Alameda Tax
       130 Gas
       200 Accounting
       220 Brakes
       2432 Employee Tax
       253.53 Van Payment

63.   Based on my training and experience, there is probable cause to believe that SUBJECT PREMISES 3 contains evidence, fruits, and instrumentalities of the violations under investigation because owners and high level operators of such businesses will keep records related to their businesses at their residences. Additionally, based on my training and experience, owners and operators of marijuana related businesses will oftentimes maintain quantities of marijuana at their residences either for personal use or for creating new products with marijuana or the marijuana derivatives.

H.   Information Regarding Supplies And Raw Materials Ordered By TAINTED To Manufacture And Distribute Marijuana Or Edibles Containing Marijuana Derivatives

64.    On July 10, 2007 Guittard Chocolate Company in Burlingame, California provided information that Michael MARTIN was the contact person for a customer known as The Painted Truffle located at SUBJECT PREMISES 1. I believe that the word Painted was used instead of Tainted in an attempt to hide the true nature of TAINTED and to avoid suspicion that the chocolate was to be used in an illegitimate manner. The results further provided that The Painted Truffle account, during the years of 2006 and 2007, ordered four types of products from Guittard. They are dark chocolate flavored Apeels, vanilla flavored Apeels, sugar-free dark chocolate round wafers, and sugar-free milk chocolate round wafers. The Apeels name was identified on TAINTED products by Orinda PD in March 2006 and by me during my surveillance of the building containing SUBJECT PREMISES 1 on May 10, 2007. The total weight of the chocolate over the two years was 7,850 pounds, which is almost 4 tons of chocolate. Furthermore, Guittard Chocolate billed The Painted Truffle $14,637.00 for these items. Based on the quantity of chocolate ordered, I have probable cause to believe that TAINTED is using the chocolate products ordered and purchased from Guittard Chocolate Company to make their TAINTED Medicinal Edibles containing marijuana derivatives such as THC.

65.    On July 26, 2007, I also received information California Glass Company in Oakland, California. California Glass Company records indicated that TAINTED was a customer with contact names of Kerry RILEY and Jessica SANDERS. RILEY was listed as the owner, while SANDERS was listed as the general manager. A contact phone number of 888-824-6863 was listed for RILEY, and 510-461-1496 was a telephone number listed for SANDERS. This was the same phone number that was dialed by a DEA Special Agent where he then observed SANDERS answer the phone as described previously in paragraph 35. A majority of all the invoices were addressed to Kerry RILEY at 1340 Vallejo Street #1, San Francisco, California. Agents are unaware if RILEY resides at this address.

66.    Starting in June 2007, the invoices were addressed to TAINTED and Jessica SANDERS. California Glass provided invoices that dated back to September 23, 2003. An analysis of the invoices indicated that in 2007 a grand total of $7,526.62 had been spent by TAINTED on products from the glass company. Furthermore, a total of 1584 four ounce flint straight side jars were ordered from California Glass. These jars are identical to the jars that were obtained by DEA Special Agents during the controlled purchase of TAINTED products on August 13, 2007, which is described above. The jars seized on August 13, 2007 contained, according to the label, TAINTED peanut butter with an active ingredient of cannabis butter. It is my belief that TAINTED is using the products ordered and purchased from California Glass Company to package their marijuana edibles.

I.    Summary of Probable Cause In Support Of Criminal Complaint And Arrest Warrants

67.    Based on the facts set forth in this affidavit, I believe there is probable cause to believe that defendants Michael MARTIN, Jessica SANDERS, Michael ANDERSON, and Diallo MCLINN violated 21 U.S.C. § 846, conspiracy to manufacture and distribute controlled substances, between May 2007 and August 2007 as a result of their involvement and actions in furtherance of manufacturing marijuana and marketing and selling edibles containing marijuana derivatives through TAINTED. A summary of facts supporting each defendant's involvement in the conspiracy is set out below.

a.    A summary of facts supporting MARTIN's involvement in the conspiracy include:

    i.    MARTIN was identified by the anonymous e-mail tip as being involved in the illegal sale of edibles with marijuana derivatives.

    ii.    MARTIN was identified by the CS as being involved in the illegal sale of edibles with marijuana derivatives.

    iii.    MARTIN was seen having the keys to access SUBJECT PREMISES 2, where information indicates that marijuana is being grown.

    iv.    MARTIN was identified by ANDERSON as ANDERSON's boss as they were seen driving boxes believed to be containing edibles with marijuana derivatives from SUBJECT PREMISES 1.

    v.    MARTIN is identified as the CEO of TAINTED according to California EDD records.

    vi.    MARTIN referred the CS to his manager, SANDERS, to complete the purchase of edibles containing marijuana derivatives in August 2007.

    vii.    Documents recovered from SUBJECT PREMISES 3, which is MARTIN's residence, indicating the operation of TAINTED.

b.    A summary of facts supporting SANDERS's involvement in the conspiracy include:

    i.    SANDERS was seen coming and going from SUBJECT PREMISES 1 to a known marijuana dispensary in Berkeley, California.

    ii.    SANDERS was identified as the general manager of TAINTED by virtue at least one business card recovered in marijuana dispensaries in Southern California and order forms for edibles with marijuana derivatives to TAINTED were addressed to "Jessica," which is SANDERS first name.

    iii.    SANDERS was observed having access to SUBJECT PREMISES 2, where the information indicates that marijuana is being grown.

    iv.    SANDERS was referred to by MARTIN as the manager with whom the CS should negotiate the purchase of edibles with marijuana derivatives and negotiated the sale of these edibles to the CS in August 2007

c.    A summary of facts supporting ANDERSON's involvement in the conspiracy include:

    i.    ANDERSON was seen loading boxes believed to contain edibles with marijuana derivatives into MARTIN's SUBJECT VEHICLE 1 and when stopped by officers indicated that MARTIN was his boss.

    ii.     ANDERSON was observed entering SUBJECT PREMISES 2, where it is believed marijuana is being grown.

    iii.    ANDERSON was observed loading SUBJECT VEHICLE 2 with large, black trash bags that were believed to contain marijuana based on the smell of marijuana recognized by a DEA Special Agent.

d.    A summary of facts supporting MCLINN's involvement in the conspiracy include:

    i.     MCLINN was observed loading boxes believed to contain edibles with marijuana derivatives into MARTIN's SUBJECT VEHICLE 1 and was later identified as being a passenger in SUBJECT VEHICLE 1 when it was stopped by OPD.

    ii.    MCLINN was observed entering SUBJECT PREMISES 2 with ANDERSON, where it is believed that marijuana is being grown.

    iii.    MCLINN was observed putting the boxes containing the edibles with marijuana derivative in the car that transported the boxes to the CS in August 2007.

J.    Summary of Probable Cause In Support Of
Searching SUBJECT PREMISES and SUBJECT VEHICLES

68.    Based on the information contained in this affidavit, I believe there is probable cause to believe that in the SUBJECT PREMISES and SUBJECT VEHICLES there exists evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (manufacture or distribution of controlled substances), 846 (conspiracy to manufacture or distribute controlled substances), and 856 (maintaining a location for the manufacture or distribution of controlled substances). A summary of facts supporting the belief that fruits, evidence, and instrumentalities within each SUBJECT PREMISES and SUBJECT VEHICLE is set out below.

a.    SUBJECT PREMISES 1

    i.     DEA Special Agents observed boxes with labels and insignia's that were previously identified as containing edibles with marijuana labels being loaded into SUBJECT VEHICLE 1 at this location.

    ii.    Individuals involved with TAINTED were observed by DEA Special Agents coming and going from this location

    iii.    Guittard Chocolate listed this address as the address of its contact at what it believed was a company called The Painted Truffle.

    iv.    MCLINN was seen exiting from the building where SUBJECT PREMISES 1 is located with the boxes containing the edibles with marijuana derivative sold to the CS in August 2007.

v.    As a result of this appearing to be the TAINTED business location, there is probable cause that there will be business records related to the sale and manufacture of edibles with marijuana derivatives.

b.    SUBJECT PREMISES 2

i.    DEA Special Agents observed several of the defendants coming and going from this location.

ii.    The PG&E records indicate that this location is consuming electricity in amounts that are consistent with maintaining an indoor marijuana growing location.

iii.    DEA Special Agents identified marijuana as being taken out of this location and loaded into SUBJECT VEHICLE 2.

c.    SUBJECT PREMISES 3

i.    This is the residence of the primary operator of TAINTED, MARTIN.

ii.    A DEA Special Agent observed what appeared to be marijuana being taken into the residence.

iii.    A recent trash search revealed that documents and records regarding the operation of TAINTED and the sale of edibles with marijuana derivatives are maintained at this location.

d.    SUBJECT VEHICLE 1

i.    This vehicle is registered to MARTIN according to the California Department of Motor Vehicles.

ii.    This vehicle was seen transporting products boxes believed to contain edibles with marijuana derivatives from SUBJECT PREMISES 1.

iii.    Based on my experience and training, there is likely to be indicia of ownership and/or financial responsibility of the vehicle located in the vehicle that would confirm its ownership as well as documents such as invoices or notes related to transporting edibles with marijuana derivatives to various locations.

e.    SUBJECT VEHICLE 2

i.    This vehicle is registered to MARTIN according to the California Department of Motor Vehicles.

ii.    This vehicle was seen transporting bags believed to contain marijuana from SUBJECT PREMISES 2.

iii.    Based on my experience and training, there is likely to be indicia of ownership and/or financial responsibility of the vehicle located in the vehicle that would confirm its ownership, remnants of items transported in the vehicle, and documents such as invoices or notes related to transporting marijuana or edibles with marijuana derivatives to various locations.

K.    Information Regarding Computers And Electronic Media

69.    As part of my investigation, training, experience, and discussions with other federal law enforcement agents, I have learned the following:

a.    Data that is processed by a computer may be written to the computer hard drive or other storage medium even if the user does not intentionally save the information. For example, a computer operating system may take random data out of working memory and use it to "pad" files on a computer hard drive during the storage process.

b.    Electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time. Even when a computer user attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques.

c.    Computer files may be easily moved from computer to computer, using direct wire or wireless connections or through the use of storage media such as floppy diskettes, CDs, and USB drives. Copies of files moved in such a fashion can exist on multiple computers at the same time.

L.    List Of Items To Be Seized

70.    I seek authorization to search for and to seize the items set forth in Attachment C to this affidavit, and incorporate Attachment C as if fully set forth herein, including the procedure to secure and search for evidence stored in electronic devices and media, such as computers and CDs.

M.    Permission To Seize Computer Equipment And Peripherals

71.    Based on my training and experience, and conversations with other Agents who have experience in narcotics investigations, I am aware that it is common for narcotics traffickers to use computers and other electronic media to facilitate their illegal enterprise. Specifically, individuals involved in narcotics distribution and manufacturing keep information regarding their operations on computers, laptop computers, and diskettes. Additionally, individual searches on the Internet related to their enterprise are oftentimes retained on the computers or other electronic media. Additionally, in this case, it appears that TAINTED has a website, www.gettainted.com, which further supports by belief that evidence of TAINTED's operation will likely be found on computers or other electronic media. Therefore, I have probable cause to believe that electronic media located during the course of the present search would also contain fruits, evidence, and instrumentalities of the offenses being investigated. The search and seizure of computer hardware, computer software, computer documentation, passwords, and/or data security devices may be important to a criminal investigation in two different respects: the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or the items may have been used to

22

collect or store information about crimes (in the form of electronic data). Search procedures for computer hardware, computer software, computer documentation, passwords, and/or data security devices are included within Attachment C and incorporated by this reference.

72.    Based on my training and experience and as a result of my consultation with experts on numerous search warrant executions involving the seizure of computer equipment, I know the following:

a.    Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) the items may have been used to collect and store information about crimes (in the form of electronic data). Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes.

b.    Based on my knowledge, training, and experience I know and learned that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

i.    The volume of evidence. Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of data search on site.

ii.    Attempted deletion of electronic records and information. Electronic records and information can remain on computer storage media, such as computer hard drives, for an indefinite period of time. Even when a computer user attempts to delete records and information from a computer storage medium, the records and information may still exist and can be recovered through computer forensic techniques. These computer forensic techniques can be time-consuming, and often it would be impractical to do them on site.

iii.    Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction. In many cases, the evidentiary data can be backed up to government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer

system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

c.    Search Procedure: The search procedures for the electronic evidence is set forth in Attachment C and is incorporated by this reference

## CONCLUSION

73.    Based upon the information set forth above, I believe there is probable cause that fruits, evidence, and instrumentalities relating to the trafficking of controlled substances and maintaining a location to grow and distribute controlled substances, in violation of Title 21, United States Code, Sections 841, 846, 856 as further described in Attachment C will be found at the SUBJECT PREMISES and in the SUBJECT VEHICLES and request that the Court issue search warrants to search the SUBJECT PREMISES and SUBJECT VEHICLES.

74.    Additionally, I believe there is probable cause to support the criminal complaint and arrest warrants for MARTIN, SANDERS, ANDERSON, and MCLINN for their involvement in a conspiracy to manufacture and distribute controlled substances between May 2007 and August 2007 in violation of Title 21, United States Code, Section 846.

75.    Because of the ongoing nature of the investigation and disclosure of the information and investigative methods listed in the affidavit could compromise the investigation, I respectfully request that this affidavit, and return, be sealed until further order of the Court. However, a copy of the search warrant will be provided to any occupants of the SUBJECT PREMISES and the identified owners of the SUBJECT VEHICLES at the time of their execution.

/ / /

/ / /

/ / /

/ / /

/ / /

76.     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

_WS Armstrong_
William Todd Armstrong
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me
this 24th day of September, 2007.

THE HONORABLE ~~ELIZABETH D. LAPORTE~~
United States Magistrate Judge  *Nandar Vadas*

25

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

21 U.S.C. Section 846 -
Conspiracy to manufacture and
distribute controlled substances

☐ Petty
☐ Minor
☐ Misde-
meanor
☑ Felony

**DEFENDANT - U.S.**

▶ Michael Martin a/k/a Mickey Martin

PENALTY:

20 years imprisonment, $1,000,000 fine, at least 3 years of
supervised release, and $100 special assessment

DISTRICT COURT NUMBER

07 - 70 _ _    WDB

### PROCEEDING

**Name of Complainant Agency, or Person (&Title, if any)**
Drug Enforcement Administration

☐ person is awaiting trial in another Federal or State
Court, give name of court

☐ this person/proceeding is transferred from another
district per (circle one) FRCrP 20, 21 or 40.  Show
District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on
motion of:
☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a
pending case involving this same
defendant

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding
this defendant were recorded under

SHOW
DOCKET NO.

MAGISTRATE
CASE NO.

**Name and Office of Person
Furnishing Information on
THIS FORM**

SCOTT N. SCHOOLS

☑ U.S. Att'y ☐ Other U.S. Agency

**Name of Asst. U.S. Att'y
(if assigned)**   H. H. (Shashi) Kewalramani

**DEFENDANT**

**IS NOT IN CUSTODY**
1) ☑ Has not been arrested, pending outcome this proceeding.
If not detained give date any prior summons
was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other
charges
} ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer
been filed?   ☐ Yes   If "Yes"
☐ No    give date
filed

**DATE OF
ARREST**   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY**   Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☑ WARRANT   Bail Amount: No bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance   *Where defendant previously apprehended on complaint, no new summons
or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:

Before Judge:

Comments:

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☐ SUPERSEDING

### OFFENSE CHARGED

21 U.S.C. Section 846 -
Conspiracy to manufacture and
distribute controlled substances

☐ Petty
☐ Minor
☐ Misde-
   meanor
☑ Felony

PENALTY:

20 years imprisonment, $1,000,000 fine, at least 3 years of
supervised release, and $100 special assessment

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)
Drug Enforcement Administration

☐ person is awaiting trial in another Federal or State
  Court, give name of court

☐ this person/proceeding is transferred from another
  district per (circle one) FRCrP 20, 21 or 40.  Show
  District

☐ this is a reprosecution of
  charges previously dismissed
  which were dismissed on
  motion of:                          SHOW
  ☐ U.S. Att'y ☐ Defense          DOCKET NO.

☐ this prosecution relates to a
  pending case involving this same
  defendant                           MAGISTRATE
☐ prior proceedings or appearance(s)   CASE NO.
  before U.S. Magistrate regarding
  this defendant were recorded under

Name and Office of Person
Furnishing Information on        **SCOTT N. SCHOOLS**
   THIS FORM
                    ☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
   (if assigned)        H. H. (Shashi) Kewalramani

---

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**

DEFENDANT - U.S.

▶ Jessica Sanders

DISTRICT COURT NUMBER

07-70574 WDB

### DEFENDANT

**IS _NOT_ IN CUSTODY**

1) ☑ Has not been arrested, pending outcome this proceeding.
       If not detained give date any prior summons
       was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction
6) ☐ Awaiting trial on other      } ☐ Fed'l ☐ State
      charges

   If answer to (6) is "Yes", show name of institution

Has detainer    ☐ Yes    If "Yes"
been filed?     ☐ No     give date
                         filed

**DATE OF      ▶**      Month/Day/Year
**ARREST**

   Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED ▶**    Month/Day/Year
**TO U.S. CUSTODY**

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☑ WARRANT    Bail Amount:  No bail

   If Summons, complete following:
   ☐ Arraignment ☐ Initial Appearance   *Where defendant previously apprehended on complaint, no new summons
   Defendant Address:                    or warrant needed, since Magistrate has scheduled arraignment

                              Date/Time: _____

                              Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

21 U.S.C. Section 846 -
Conspiracy to manufacture ██████████
distribute controlled substance

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

─ **DEFENDANT - U.S.** ─

▶ Michael Anderson

**DISTRICT COURT NUMBER**

07 - 70834    WDB

**PENALTY:**

20 years imprisonment, $1,000,000 fine, at least 3 years of
supervised release, and $100 special assessment

─────── **DEFENDANT** ───────

**IS NOT IN CUSTODY**

1) ☑ Has not been arrested, pending outcome this proceeding.
   If not detained give date any prior summons
   was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

### PROCEEDING

Name of Complainant Agency, or Person (&Title, if any)
Drug Enforcement Administration

☐ person is awaiting trial in another Federal or State
Court, give name of court

☐ this person/proceeding is transferred from another
district per (circle one) FRCrP 20, 21 or 40. Show
District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on
motion of:
  ☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a
pending case involving this same
defendant

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding
this defendant were recorded under

**SHOW
DOCKET NO.**

**MAGISTRATE
CASE NO.**

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges  } ☐ Fed'l  ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
If "Yes" give date filed _____

**DATE OF ARREST** ▶  Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY** ▶  Month/Day/Year _____

Name and Office of Person
Furnishing Information on
THIS FORM

**SCOTT N. SCHOOLS**
☑ U.S. Att'y  ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
(if assigned)    H. H. (Shashi) Kewalramani

☐ This report amends AO 257 previously submitted

─ **ADDITIONAL INFORMATION OR COMMENTS** ─

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☑ WARRANT    Bail Amount: No bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons
or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____

Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

21 U.S.C. Section 846 -
Conspiracy to manufacture and
distribute controlled substances

☐ Petty
☐ Minor
☐ Misde-
meanor
☑ Felony

**DEFENDANT - U.S.**

▶ Diallo Mclinn

**DISTRICT COURT NUMBER**

CR ░░░0░░  WDB

PENALTY:

20 years imprisonment, $1,000,000 fine, at least 3 years of
supervised release, and $100 special assessment

### PROCEEDING

**Name of Complainant Agency, or Person (&Title, if any)**
Drug Enforcement Administration

☐ person is awaiting trial in another Federal or State
Court, give name of court

☐ this person/proceeding is transferred from another
district per (circle one) FRCrP 20, 21 or 40. Show
District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on
motion of:
☐ U.S. Att'y ☐ Defense

SHOW
DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding
this defendant were recorded under ▶

MAGISTRATE
CASE NO.

**Name and Office of Person
Furnishing Information on
THIS FORM**

**SCOTT N. SCHOOLS**

☑ U.S. Att'y ☐ Other U.S. Agency

**Name of Asst. U.S. Att'y
(if assigned)**    H. H. (Shashi) Kewalramani

#### DEFENDANT

**IS *NOT* IN CUSTODY**
1) ☑ Has not been arrested, pending outcome this proceeding.
If not detained give date any prior summons
was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other
charges

} ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer
been filed?    ☐ Yes    If "Yes"
☐ No    give date
filed

**DATE OF
ARREST** ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY** ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☑ WARRANT    Bail Amount:    No bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons
or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments: